[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
By petition filed April 26, 1990, the Department of Children and Youth Services (DCYS) seek to terminate the parental rights of Nogas G., mother, and, lacking an acknowledged or adjudicated father, sole legal guardian of Tikia G., alleging all four of the nonconsensual grounds set forth in Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1990; Sec. 17a-112, Rev. 1991) applicable to children committed to the petitioner as neglected or uncared-for under Sec. 46b-129. The respondent was served at Niantic prison where she was then incarcerated, and appeared with counsel to contest the allegations of the petitions. The matter was continued to secure a psychological evaluation of the mother, child, foster parents, and child's interactions with the adults involved.
By the time of a pretrial conference, Nogas, having been released from prison in the interim, was whereabout unknown to DCYS, her parole officer and her attorney. The latter's motion to withdraw because of inability to contact his clients was denied on August 28, 1990 on the expectation that she might be located and appear in court for subsequent hearings. A trial date of September 28, 1990 was set and by that time Nogas had, indeed, returned to Niantic. Since the habeas order to bring her to court for that trial date had not been honored, the matter was continued for trial to December 11, 1990 and thereafter to January 8, 1991, the mother appearing on both dates.
Following completion of the petitioner's case, no evidence was offered CT Page 4256 by the respondent sand he exercised her statutory right to remain silent (Sec. 46b-137) when called as a witness by the child's attorney. All parties were given to February 19, 1991 for the simultaneous filing of trial memoranda, and the child's attorney was to submit to the court in writing the child's position after again visiting with her. On February 14, 1991, at the request of the mother's counsel, the time for filing trial memoranda was extended to March 2, 1991. Her memorandum was not received, however, until March 6, 1991. Neither the petitioner nor the child filed trial memorandum. On March 21, 1991 the respondent filed a motion to dismiss this action under Sec. 251 of the Practice Book for failure to the other parties to file trial memoranda, alleging prejudice to the respondent should they be permitted to file written argument in response to her claims, rather than simultaneously therewith as permitted by the court. She also claims prejudice form the child's attorney's failure to communicate to the court and the other parties, the child's position as to the termination of her mother's parental rights.
At the hearing on this motion held April 5, 1991 Tikia's position was communicated to the court through a letter from her counsel whose motion to extend time for the filing of a trial memorandum was denied as untimely. Decision was reserved on the mother's motion to dismiss.
The period of reserved decision is deemed to begin on March 6, 1991, the date of submission of the only trial memorandum to be held in this action.
Respondent's motion to dismiss
At the outset the court must address the issue of whether the Practice Book rules for civil cases are fully applicable to juvenile matters. Where the subject addressed is not covered by either statute or Practice Book rule specifically applicable to juvenile matters, where the application of a particular Practice Book rule is necessary to provide a full and fair hearing to tall parties, and where such application will not unduly delay the final resolution of the underlying custodial issues the rule may be applied in juvenile matters. The "failure to prosecute an action with reasonable diligence" is covered neither by statute nor the juvenile chapter of the Practice Book. Unwarranted delays in processing unresolved custodial issues could well result in depriving one or more of the parties to a full and fair hearing. The purpose of Rule 251 which permits dismissal of an action for "failure to prosecute" is to expedite not to delay, final resolution of cases. Consequently Rule 251 is deemed to apply to the instant case.
The second threshold issue is whether the filing of post-trial memoranda is art of the "prosecution" of a noncriminal action. While the period of reserved decision CT Page 4257 under Sec. 51-183b does not commence until the time set for the filing of trial memoranda, Frank v. Streeter, 192 Conn. 601,604 (1984), the "prosecution" of a civil action has ended when all parties have rested and no further evidence may be introduced without a separate motion to reopen. Trial memoranda are for the benefit of the parties filing, summarizing evidence already offered and arguing for the positions advocated based upon that evidence. Failure to file such trial memoranda is a detriment only to the party failing to file — not to the party opposed. The appropriate sanction for failing to file such memoranda, when, as here, it is made discretionary with the parties, is that the court will take the papers and render a decision without the benefit of such summarization and argument. It such filing has been ordered by a court, the proper sanction should be judicial discipline for failure to comply with an order of the court. In cases for termination of parental right initiated by DCYS, the petitioner's argument already exists in the form of the social study mandated by Sec. 45-611(e), marked as State's Exhibit A in this action. If the evidence offered by DCYS in accord with that document, its trial memorandum would be a redundancy; if not in accord, it is the respondent's task to point that out to the court in her memorandum.
Even if the filing of trial memoranda were deemed to be a part of the "prosecution" of an action, granting motions under Practice Book 251 is discretionary in what way she is harmed by the failure of the petitioner and the child to file trial memoranda. Her concern that memoranda with conflicting points of view might be accepted by the court after the submission of hers, rather than simultaneously as permitted by the court, proved unfounded since the court refused to consider any such memorandum submitted after the extended filing date — except that of the respondent herself which was received by the court four days after the extended filing date. Lacking any offer of proof as to how the mother's position has been jeopardized by the failure of the other parties to submit trial memoranda, her motion to dismiss is denied.
Facts
Evidence offered in two trial days, interpreted in the light of the prior record in this court concerning this respondent and her child-caring capacities, of which judicial notice is taken, support the finding of the following facts:
Tikia was born November 20, 1980, the third child born out of wedlock to her then 22 year old mother who had, herself, been a ward of the state for many years. When Tikia was five years old, she was taken to Oregon to live by her mother. Six CT Page 4258 months later, when her mother was arrested, she and her two older siblings were sent by Oregon authorities back to Connecticut to live with a maternal aunt in Hartford. When the aunt found she could not add three more children to her existing household, she asked DCYS to place them. Nogas, however, when informed of this development, refused to sign a voluntary permission to place the children, instead threatening her sister if they were to be put into foster care. Consequently, since DCYS may not place children without parental or judicial authorization, petitions were filed alleging the children to be uncared for since they were homeless, and they were placed in foster care under orders of temporary custody pursuant to subsection (b) of Sec. 46b-129.
Prior to the hearing on the temporary custody set for August 11, 1986, the court appointed an attorney to represent the mother who remained incarcerated in Oregon. On that date the temporary custody order was confirmed without prejudice. Soon after, Nogas wrote to the court requesting that her children be placed with her parents. Contact was made by DCYS but the parents did not follow through. Consequently, on January 6, 1987, in the continued absence of the mother but with her court-appointed counsel present, Tikia was committed to DCYS as an uncared-for child for an initial period of 18 months.
Nogas arranged to have her parole supervision transferred from Oregon to Connecticut and by late March of 1987, after eight months without having seen them, she began to visit her children. Learning of her reappearance in the state, a judicial review was set for the purpose of spelling out expectations calculated to lead to a reunification of the family. Nogas failed to appear at that hearing on May 12, 1987. In her absence, but with her attorney present, such expectation were spelled out which included maintenance of contact with DCYS, visitation as permitted by DCYS, the securing of housing and an adequate source of income, and the avoidance of further problems with the criminal justice system. Her attorney was requested to review those expectations with her and return a copy, after she signed it, for the court file by June 2, 1987. A subsequent review was held on June 18, 1987 after her attorney reported he had been unable to make contact with his client. At the same time, the DCYS social worker assigned to the case reported that he, too, had been unable to contact the mother although she was in the area, having visited the children as recently as June 10, 1987.
A treatment plan prepared on July 2, 1987 continued to be to reunite the children with their mother after she had secured housing. Later that year, after the social worker CT Page 4259 reported having had no contact with Nogas for five months and after securing a psychological evaluation of the children, DCYS determined that petitions to terminate the mother's parental rights would be filed in February of 1988.
February 1988 came and went but no termination petition was filed. Instead, in April of 1988, DCYS filed a petition, pursuant to subsection (e) of Sec. 46b-129, seeking to extend Tikia's foster care status for a second period of 18 months. Nogas had called the social worker in February to report that once again she was incarcerated at Niantic and expected to be released in two weeks. When she had not been released after four weeks, the children were brought to see her for a visit at the prison on March 7, 1988. Nogas was invited to telephone the children on a weekly basis thereafter but never did so.
A hearing on the extension petition held on May 10, 1988 was attended by the mother and her attorney. In view of her incarceration, she agreed to the continuance of Tikia's commitment, without prejudice to her residual parental rights. The court's expectation of the previous year were reiterated and enlarged by the addition of cooperation with the children's therapy, and the amended list signed at last by the mother.
Nogas G. was again released from Niantic later in May of 1988, giving birth the next month to a fourth child. In its treatment plan of July 7, 1988, DCYS, for the second time, announced its intention to file a termination petition if the mother did not begin consistent compliance with these expectations by October of that year.
October, 1988, came and went but no termination petition was filed. Nogas had begun cooperation in late July of 1988, taking Tikia for a visit one day each week-end, but a month later she left her new baby with friends and disappeared. The infant was given to a relative and after two week without contact form Nogas, lacking any provision for the care of the infant, the relative asked DCYS to place her in foster care. On September 8, 1988 DCYS filed co-terminous petitions pursuant to subsection (c) of Sec. 17-43a. Her whereabouts again having become unknown, Nogas was served by publication. Just as in the case of Tikia and her older siblings a date was set for what was anticipated to be a default trial, but at the time appointed Nogas had been located and appeared, necessitating continuance of the trial. At the continued trial date, however, she failed to appear. Grounds were found, by default, to terminate her parental rights to the baby but a further continuance was necessitated by the failure of DCYS to submit the study mandated by subsection (e) of Sec. 45-6. (Sec.45a-717, Rev. 1991). At the final hearing on January 3, 1989, CT Page 4260 Nogas again appeared. This time she demanded a new attorney, and when that request was denied as untimely, she walked out during testimony, voicing audible threats against the social worker. The trial proceeded to a judgment terminating her parental right in the baby, and no appeal was taken therefrom.
Notwithstanding the mother's unchanging pattern of behavior for two and one-half years, the DCYS treatment plan of January of 1989 continued to be reunification of the family, again adding that if Nogas failed to make clear steps toward achieving that goal in (yet another) three months, a petition to terminate her parental right would then be filed.
April, 1989, came and went, but not termination petition was filed. Nogas' consistency was matched only by that of DCYS. In October of 1989, after again reciting the mother's total noncompliance with the expectations for reunification, DCYS filed a second petition to extend Tikia's status as a state ward. Her whereabouts having again become unknown, service of this petition was again by publication. She did not appear on November 16, 1989 when Tikia's commitment was extended for a third 18-month period DCYS was ordered to submit in writing its reasons for failing to secure a permanent plan for Tikia after more than three years in foster care. In January of 1990 DCYS announced it permanency plan: To file a termination petition by March. It was, in fact, filed at the end of April by which time Nogas, once again back at Niantic, was available for personal service and participation with counsel in the court proceedings, except for one pretrial conference in August of 1990 called during a brief period when Nogas was out of prison and, again, whereabouts unknown.
There were three contacts between mother and daughter in 1990: A brief visit in January; a joint evaluation by a court-ordered psychologist at the end of June, and a telephone call in November. Until the last event, Tikia's foster parents were willing to adopt her, should her mother's parental rights be terminated, and Tikia was looking forward to this eagerly, expressing her desire to do so directly to her mother during the clinical interview, and having picked out what her "new name" would be after becoming a full member of her foster family. Nothing was resolved, however, and when Nogas telephoned her daughter in November of 1990, Tikia became upset, acting out to an extent that caused the foster parents to reconsider their desire to adopt her. They continue, however, to be willing to keep her in their home indefinitely.
These three contacts in 1990 were the only interactions between Tikia and he mother since August of 1988 when the sporadic visitation which had taken place during the periods CT Page 4261 when Nogas was out of prison stopped altogether. From August of 1988 to August of 1989 the mother's whereabouts were unknown, and although Tikia remained in the same foster home since late 1986, the address and telephone number of which were known to Nogas, no contact occurred, in person, by telephone or mail, even at the time of the child's birthday or Christmas of 1988. On August 3, 1989, Nogas called DCYS asking for a visit. An appointment was set for a visit at the DCYS office on August 11, 1989. Tikia was brought there for the visit but Nogas failed to appear or to call to cancel or explain and, characteristically, DCYS had no means of contacting her. More than three months passed before the next contact.
On November 28, 1989 DCYS was contacted by prison staff and told that Nogas had been incarcerated at Niantic for the last month and wanted Tikia brought there for a visit. DCYS denied this request on the ground that after 15 months without contact of any kind, and the failed visit of August 11, 1989, which had upset the child, the decision had been made to initiate termination proceedings. Resumption of contact between mother and child under these circumstances was predicted to be harmful to the child. Nogas told the social worker she understood it was hard on Tikia, but she disagreed with his decision and would consult an attorney about having it reversed. She did not do so. (Testimony of Wiggins, December 11, 1990).
Nogas was released from prison briefly, but was back in Niantic by March of 1990 and remained there when this petition was filed. At no time since August of 1986 when DCYS first assumed Tikia's custody has it had any address for Nogas other than Niantic. On the rare occasions when she was released from prison and made contact with DCYS she refused to reveal her address, appearing to move from friend to friend or to shelters. She was given the foster parents' address and telephone number and was never told she could not visit or telephone there. On five occasions, before all visits stopped in August of 1988, Nogas had called ahead for visits but failed to appear. At first Tikia appeared disappointed but later "got used to it." (Testimony of Thompson, January 8, 1991).
The clinical psychologist who evaluated Tikia's relationship with her mother and with her foster parents found a parent-child bond between the latter and the child but essentially only the knowledge of kinship between her and her biological mother. (Testimony of Dr. Mantell, December 11, 1990). Nogas admitted to him in the evaluation that she had used drugs as recently as three months before the June 1990 interview, and that she had stopped visiting her daughter in 1988, but gave no reason for this. During the evaluation, when CT Page 4262 Nogas asked her daughter abruptly and, according to the evaluator, inappropriately, who she wanted to live with, Tikia clearly stated with the foster parents.
Nearly four years after her daughter was placed in foster care, Nogas still had no immediate plan for resuming her care and, in fact, approved of her remaining in the foster home still longer. The psychologist found it would have a "devastating impact" for the rest of her life if Tikia were to be removed from these foster parents. In his opinion, should they become unable to continue caring for her it would be preferable for Tikia, even at her age, to be adopted by strangers than to wait any longer for her mother's pattern to change. Consequently, he recommended termination of the mother's parental rights without delaying further. Even if Nogas could change her pattern and do everything "right" — remain drug free, avoid criminal activity, obtain employment, enter parenting counselling and visit regularly — it would take years before she could even begin to resume care of the child. Given her long established pattern of planlessness, homelessness, repeated involvements with the criminal law, and infrequent visitation, he found such an outcome unlikely. (Id.) During their joint evaluation on June 27, 1990, while Tikia and her mother evidenced a knowledge of one another, they were unfamiliar with each other's lives after being so long out of touch:
 Though there is a sense of an ongoing kinship bond, there is no sense of an ongoing relationship between the two. The daughter does not know where the mother is living. The mother does not know the child's grade or even the school she attends. (State's exhibit B, p. 4).
Two minutes after their first extended encounter in nearly two years, Nogas asked the child if she wanted to be adopted:
 The child looked worried and hesitant before she replied shaking her head yes. The mother then asked whether the child wants to stay with the . . . [foster parents]. The child nodded yes again. The mother asked her to be honest saying that she would love her anyway. The child affirms her prior statements with a knowing look to her mother.
Later Nogas acknowledged to the evaluator that Tikia had said these things because of being happy in her foster CT Page 4263 home, but she did not believe Tikia meant it. (Id., p. 5-6). The mother could not give a specific time when she could care for Tikia again, speculating that it might be in six months, maybe three. (Six months after this evaluation, Nogas was, in fact, back in prison). The evaluator concluded that Nogas . . .
 . . . is, by history, a person with an antisocial personality disorder who additionally is impulsive, frequently incarcerated, with a history of substance abuse, most recently three months ago, primarily cocaine but also alcohol by history. She lives her life in a disorganized and planless way. Her future prognosis is poor. (Id., p. 9). . . . [she] is characterologically impaired as a consequence of her antisocial personality disorder, her use and sale of drugs . . . . A rehabilitation of the mother within the foreseeable future could not be established as a reasonable likelihood . . . . (Id., p. 10).
Adjudication on facts as of April 26, 1990 when this petition was filed
Since the petitioner filed no amended pleadings, the date of the original filing shall be deemed the date on which the existence of grounds to terminate the parental rights of Nogas G. must be determined. As of that date, April 26, 1990, clear and convincing proof was offered to support three of the four grounds pleaded for such termination:
1) During the first two years of Tikia's placement the mother visited her only sporadically. For the full year of August 1988 to August 1989, there were no contacts of any kind, no cards or gifts or phone calls, even on Tikia's eighth birthday or Christmas of 1988. In August of 1989 Nogas requested a visit and one was quickly arranged. She failed to appear for this visit, leaving the child confused and saddened. Three months later a request from prison — where she had been incarcerated for a month before notifying DCYS — was denied, the petitioner having determined that reawakening the relationship on the eve of initiation of a termination proceeding would have negative impact on the child. Nogas was invited to question this decision through her attorney but did not do so. She made no effort to see her daughter during the brief time that she was out of prison, and when this action was finally initiated she was back in Niantic. At all times she has had the phone numbers of both the foster parents and DCYS but she has never inquired as to any aspect of her daughter's life. Her ignorance of the most salient features of that life was illuminated in the psychological evaluation. This constitutes CT Page 4264 proof that is both clear and convincing that for at least the two years prior to the filing of this petition this child was abandoned by her mother ". . . in the sense that the parent has failed to maintain a reasonable degree of interest concern or responsibility as to the welfare of the child."
2) Tikia first came into state custody in Connecticut in 1986 because her mother was incarcerated. Nearly four years later, her mother is still in prison, having entered and existed from Niantic a number of times in the interim. By her own admission to the court-appointed psychologist she has had ". . . a history of alcohol and drug abuse, multiple arrest and imprisonments, prostitution from the age of 16 to 26, multiple cases of venereal disease and has no completed drug and alcohol rehab program [sic]." (State's Exhibit B, p. 5). She was not available to the court nor to her own attorney at the time Tikia was originally committed to DCYS on January 6, 1987, and for the next three years only when she has been in prison has DCYS known her whereabouts. She has never received treatment or counselling for her substance abuse problems or for her unacknowledged lack of parenting skills. In April of 1990 she was exactly as she had been in August of 1986 when Tikia first entered foster: care; Homeless, planless, repeatedly involved in criminal activity that results in further incarcerations, involved in substance abuse and uninvolved in treatment for it, and denying any lack of care for her children. That she has never offered a plan for the child's care is not surprising considering the lack of any plan for her own life. This constitutes clear and convincing proof that this parent "of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding . . . [has] failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child."
3) While Tikia acknowledges kinship with her mother — having lived with her for the first half of her life — the record contains no evidence that there exists an "ongoing parent-child relationship" defined by the statute as that "relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." Even under the interpretation of this language in In re Jessica M., 217 Conn. 459
(1991) it cannot be found that knowledge of kinship alone constitutes a parent-child relationship with the requisite "positive attributes." (Id., at 470). Despite Tikia's knowledge of a family relationship with Nogas, this record supports a finding "that no positive emotional aspects of the relationship survive." (Id.) The absence of a parent-child CT Page 4265 relationship, however, does not alone constitute grounds for terminating a parent's rights. The court must also find that "to allow further time for the . . . reestablishment of such parent-child relationship would be detrimental to the best interests of the child." Nogas, having made no change for the better either in her own life or in the relationship with her daughter in the more than three years that preceded initiation of this action, has a poor prognosis for change in the future. Prolonging Tikia's status as an impermanent foster child, always faced with the possibility of renewed contact with her mother, can only have detrimental results. The evaluator recommended adoption by strangers if the foster parents could not keep Tikia permanently, as preferable to waiting longer for the biological mother to rehabilitate.
A fourth ground pleaded — acts of parental commission or omission which results in depriving the child of proper care — is dismissed absent of any offer of proof that Tikia has been denied such care by any acts, or failure to act, by the mother, other than the infrequency of visitation which supports the other findings above.
Disposition — on facts as of January 8, 1991, the final trial date
The processing of this petition was delayed principally because of the mother's continuing pattern of being available for court hearings only when incarcerated, and being whereabouts unknown for court process or communication with counsel at all other times. In the more than eight months between the filing of this petition and the final day of trial, no change occurred in Nogas G.'s situation: She remained in and out of prison, with whereabouts unknown when at liberty. As in the two prior years, both Tikia's birthday and Christmas passed unmarked by any communication to the child from her mother except a single phone call in November of 1990 which caused Tikia to be highly disturbed emotionally. The situation remains as it was at the time the petition was filed — and indeed as it was for the two years preceding — with no evidence of the mother's compliance with any one of the enumerated expectations for reunification. Before the court may terminate a parent's rights, it must consider the six factors set forth in subsection (d) of Sec. 17-43a:
(1) Services for reunification cannot be offered to a parent whose whereabouts are known to DCYS only when she is incarcerated. Nogas had the foster parents' name, address and telephone number and was invited to make her own arrangements for visitation. She did this initially, albeit sporadically, and then ceased altogether for over a year without explanation. CT Page 4266 She was recommended to enter drug treatment and did not do so. She was advised to avoid further encounters with the criminal law and could not do so. Under all of these circumstances, no further services could be offered.
(2) While not orders, none of the court's expectations, to which Nogas agreed in court in May of 1988, have been complied with two years later.
(3) The child's emotional bond with foster parents of more than four years, and its disturbance by the mother's single phone call in November of 1990, support the conclusion that strengthening that bond by eliminating by eliminating even the possibility of the mother's disrupting her placement is essential for the child's psychological stability.
(4) Tikia will be eleven years old in November of 1991. She has not lived with her mother since she was five years old, and has not had even sporadic visitation from her since she was seven. Before she enters puberty it is necessary that the question of who is going to raise her to maturity be resolved at last.
(5) Nogas made no efforts to adjust her circumstances , conduct or conditions to make it in Tikia's best interests to return to her home in the foreseeable future. Indeed, even Nogas could not foresee the time when such return could take place, perhaps because at no time since she returned to Connecticut in early 1987 has she had a home.
(6) The only impediment to maintaining a meaningful relationship with Tikia was the refusal of DCYS to permit a single prison visit to Nogas at Niantic when she requested it in late November of 1989 — fifteen months after she had last seen her daughter. While it is unfortunate for all parties that DCYS delayed filing this petition for five months after such refusal, dereliction of responsibility by a state agency should not necessitate an outcome that is detrimental to a child.
Having considered the foregoing it is found, by clear and convincing proof, to be in Tikia's best interests for her mother's parental rights to be terminated so that she will be free to be adopted by her present foster parents or, failing adoption, be raised by them in permanent foster care without disturbing intrusions by the biological parent. If the foster parents cannot raise Tikia to maturity, such termination will render her free for adoption by another family, preferable to lingering in the limbo of foster care awaiting reunification with a mother who has evidenced no sign of either ability or CT Page 4267 motivation to resume her care in more than four years. Therefore, it is ORDERED that the parental rights of Nogas G. be, and hereby are, terminated, and that the Commissioner of DCYS be appointed statutory parent for the purpose of implementing a plan for her permanent placement. Such Commissioner is ORDERED to submit to this court in writing a report within 90 days of the date of this judgment as to the progress toward such a plan, and if adoption has not been finalized by August 15, 1992, said Commissioner is ORDERED to file on that date a Motion To Review Plan For Terminated Child to be in conformity with federal law.
Appeal
The parent has 20 days from the date of this judgment in which to take an appeal. If she decides to pursue an appeal and her counsel at trial is willing to represent her in it, this court will appoint him to act as appellate counsel at public expense until all appellate process is completed. If, however, in the exercise of his professional judgment as an officer of the Superior Court, he declines to perfect such appeal because, in his opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Such motion, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, he or she is required promptly to submit to the court in writing the reasons for this opinion. The parent will then be informed by the court clerk that there is the balance of the 40 days in which to secure her own counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. This procedure conforms to the principles of Douglas v. California, 372 U.S. 353 (1963), adopted for Connecticut in Fredericks v. Reincke, 152 Conn. 501
(1965), in which it was held to satisfy an indigent criminal defendant's constitutional right to counsel on appeal if, after the public defender at trial notifies both client and court that "he could not conscientiously proceed with the appeal," another attorney is appointed to consider the merits of the appeal and comes to the same conclusion. Even a convicted criminal defendant "cannot demand that the trial court find and appoint other counsel who will advise such appeal" after the second public defender has declined to do so. Fredericks v. Reincke, 152 Conn. at 505. If such procedure satisfies the sixth amendment right to counsel where the only conflicting interests are those of a defendant who seeks review of his conviction and of the state which has a legitimate interest in CT Page 4268 avoiding the expense and judicial burden of meritless appeals, it is a fortiori appropriate where there are interests of third parties involved: those of the child whose interest in achieving permanent nurturing parents is entitled to at least as great a degree of consideration as those of her parent whose right to raise her, brought into question because of past acts of omission, is at issue. Even an unsuccessful appeal could delay permanent planning for this child for years since no child may be adopted until the appellate process is exhausted and the termination order final.
If an appeal should be taken, the judgment of termination shall be stayed during its pendency, but throughout this period all decisions made by DCYS, as the child's continuing legal guardian, as to contacts with her natural parent shall be based solely upon the child's best interests, not upon the parent or the lingering possibility of an eventual reunification. Whatever obligation is imposed upon DCYS by federal and state law to make continuing efforts to reunite committed children with natural parents ends upon a judicial finding that grounds exist to terminate parental rights.
Entered this 14th day of May 1991.
BRENNEMAN, J.